[Cite as *State Collection & Recovery Serv., L.L.C. v. Earl*, 2023-Ohio-104.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

State Collection and Recovery
Service, LLC

 Appellee

v.

Christine Earl and Robert Earl

 Appellants

Court of Appeals No. H-21-018

Trial Court No. CVF2100960

**<u>DECISION AND JUDGMENT</u>**

Decided: January 13, 2023

* * * * *

Bonnie M. Porz and Sue G. Porz, for appellee.

Loretta Riddle, for appellants.

* * * * *

OSOWIK, J.

**{¶ 1}** This is an appeal from a November 8, 2021, judgment of the Norwalk

Municipal Court, granting a collection judgment to State Collection and Recovery

Services, LLC ("appellee") in the amount of $6,481.31 for the unpaid balance of health

care services rendered in 2016-2020 to Christine and Robert Earl ("appellants") by service providers Fisher-Titus Medical Center, Bellevue Hospital, and North Central EMS. For the reasons set forth below, this court affirms the judgment of the trial court.

{¶ 2} Appellants set forth the following two assignments of error:

1. THERE WAS NOT [A] LEGAL SUFFICIENCY OF [THE] EVIDENCE, THE TRIAL COURT[']S DECISION WAS AGAINST THE WEIGHT OF THE EVIDENCE.

2. THE TRIAL COURT ERRED IN NOT FINDING [THAT] APPELLANTS RELIED ON APPELLEE'S PAST PRACTICE AND PROMISES.

{¶ 3} The following undisputed facts are relevant to this appeal. This case arises from appellants' default on a voluntarily negotiated, 60-month, interest-free, monthly payment plan of $78.23 for unpaid health care services. The payment plan was arranged following sizeable write-offs and reductions granted to appellants, forgiving most of the outstanding monies owed for health care services rendered to them during 2016-2020 by Fisher-Titus Medical Center, Bellevue Hospital, and North Central EMS.

{¶ 4} The record reflects that prior to the filing of the collection action, the billing statement balances were reduced to reflect the amounts paid by appellants' insurance provider, reduced to reflect sizeable insurance contract adjustment reductions permitted by the contract guidelines, reduced to reflect charitable reductions voluntarily given by

2.

the health care providers, reduced to reflect additional write-offs voluntarily given by the health care providers, and reduced to reflect the 18 monthly payments that were received prior to appellants' default on the residual balance owed.

{¶ 5} On July 16, 2021, approximately one-year after appellants' default, a consolidated debt collection complaint was filed by appellee, as assignee for the health care service providers, in the Norwalk Municipal Court, seeking judgment in the amount of $7,764.23 for the outstanding balances owed.

{¶ 6} During the pendency of the action, the amount of the collection judgment sought by appellee was reduced by an additional $1,282.92, to $6,481.31, to reflect the receipt of an additional insurance payment and to reflect North Central EMS's decision to fully write-off their portion of the outstanding debt.

{¶ 7} The record shows, as reflected in both the transcripts of the trial court proceedings and in appellants' brief in support of this appeal, that this appeal is rooted in appellants' unsupported claims of general impropriety in connection to the health care provider billing statements. These claims arose after appellants' default and dissatisfaction with the post-default payment plans offered by appellee to avoid formal debt collection action.

{¶ 8} Contrary to appellants' suggestion on appeal of malfeasance of some sort by the providers in connection to the residual monies owed, the record reflects considerable efforts by all of the health care service providers to significantly reduce and minimize,

3.

via an array of debt forgiveness methods, including write-downs, write-offs, charitable reductions, and interest-free, minimum-monthly-payment, financing, the remaining balance owed by appellants.

{¶ 9} Unfortunately, appellants defaulted on their $78.23/month payment plan, triggering a collection action. While appellants' generically suggest that Covid necessitated their default, appellants' chief income stream, social security disability payments, and their insurance coverage, Medicare, were not impacted by Covid. In addition, the record reflects that the medical costs incurred were not connected to Covid-related medical care.

{¶ 10} On October 21, 2021, a bench trial was held in the Norwalk Municipal Court. Appellee was represented by counsel, while Robert Earl ("Earl") represented appellants on a pro se basis.

{¶ 11} The trial transcripts reflect that appellee first called Carmelo Delgado ("Delgado") as a witness in support of the collection judgment. Delgado is employed as the operations manager for appellee.

{¶ 12} Delgado first testified regarding the assignment agreements, the documentation consisting of the written agreements executed between appellee and the above-named health care service providers, granting appellee the right to pursue collection of the remaining monies owed by appellants after their default in this case.

4.

The assignment agreements expressly permitted all outstanding account balances to be consolidated for debt collection purposes, as was done in this case.

{¶ 13} Upon cross-examination of Delgado, Earl repeatedly attempted to interject hearsay testimony. For example, rather than posit a question, Earl testified during cross-examination, "I had [a post-default conversation] with [someone at] your company [assignee State Collections] who said they'll take no less than $300 [a month] on this account * * * We'll leave it at that." The record reflects that objections were made, and were sustained, to the hearsay testimony.

{¶ 14} Upon redirect, Delgado explained the criteria of appellee's payment plan options offered to avoid formal collection action. Delgado stated, "Our payment plans depend on the [post-default] balance of the account * * * We try to collect it in 12 months * * * The maximum amount we [are permitted to] go is 18 months."

{¶ 15} Earl persisted in direct testimony during Delgado's cross-examination. Upon re-cross of Delgado, Earl testified, "[Y]our policy is good on paper, and may work for [assignee State Collection], but if you want to collect money from us, you have to realize that we have to eat." In response, appellee objected, "Objection, your honor, once again he's testifying." The objection was sustained. In addition, the record reflects no evidence supportive of the underpinnings of appellants' suggestion.

{¶ 16} Appellee next called Dawn Gfell ("Gfell") as a witness in support of the judgment sought. Gfell is employed as a financial counselor with Fisher-Titus. Gfell

5.

described the nature of her job duties and responsibilities, as well as her direct familiarity with this case based upon her direct dealings with appellants prior to their default.

{¶ 17} Gfell testified in detail regarding her knowledge of, and the accuracy of, the billing statement documentation. She also testified in detail regarding the corresponding financial agreements executed by appellants, expressly accepting financial responsibility for the health care services rendered.

{¶ 18} Gfell gave detailed testimony regarding the various write-offs and charitable reductions that were voluntarily applied to appellants' accounts in order to minimize the remaining monies owed by them.

{¶ 19} For example, Gfell testified regarding Plaintiff's Exhibit N, the Fisher-Titus billing statement for health care services rendered to Earl on January 13, 2020. Gfell testified that, "[T]he [residual] total amount due and owing is $118.77." The document reflected, and Gfell testified, that the initial charges were reduced by an $881.94 Medicare payment, reduced by a sizeable contract adjustment reduction of $4,111.44, reduced by a write-down on the remainder by Fisher-Titus of $165.02, reduced by a charity reduction by Fisher-Titus of $41.26, and reduced by the $65 paid by appellants. Following the $5,264.66 in reductions, adjustments, write-offs, and payments, a balance of $118.74 remained due and owing by appellants.

6.

{¶ 20} Upon further cross-examination of Gfell, Earl attempted to insinuate something nefarious in the billing statement documentation which, in actuality, reflected mandatory HIPPA redactions.

{¶ 21} Earl opined, "*Where did that come from? I mean look at others, and they show a whole list of items before they come up with it, before – there's, obviously * * * Who makes this decision?*" (Emphasis added).

{¶ 22} Appellee interjected, "*Your honor, if I may interrupt?*" After being granted leave to do so, appellee explained, "*These – our itemized statements, they have been redacted because of HIPPA.*" (Emphasis added).

{¶ 23} Earl next generically suggested, without evidentiary support, accounting malfeasance in connection to this matter. Upon further cross-examination of Gfell, Earl inquired, "*Have you ever added entries to a statement that belonged to another statement?*" Gfell replied, "*No.*" Earl persisted, and next stated, "*No? That's never happened?*" Gfell again replied, "*No.*" (Emphasis added).

{¶ 24} Earl's claims next suggested, again without evidentiary support, that the billing statements contained coding errors. Upon cross-examination, Earl inquired of Gfell, "*Is it possible there is a coding error there?*" Gfell replied, "*No.*" Earl persisted, "*[Are you] absolutely sure there's no coding error?*" Gfell ultimately replied, "*If you have an issue with the commercial insurance payment, you need to address that with your insurance company.*" (Emphasis added).

7.

{¶ 25} Gfell next testified regarding her primary role in assisting appellants in obtaining and arranging financing for a minimum-monthly-payment plan for the outstanding balance on their accounts, including Fisher-Titus writing off all interest owed by appellants associated with the financing, resulting in interest-free financing.

{¶ 26} Gfell testified, "We had a very reasonable payment arrangement of $78.23/month for 60 months; however, [appellant's] defaulted on the loan after 18 months." Approximately one-year after appellants defaulted and informal collections efforts failed, the matter was assigned to appellee for collection purposes.

{¶ 27} At the conclusion of trial, appellee conveyed, "[I]t's clear that many of these statements were not paid. All insurance adjustments were made. Charity adjustments were made. Medicare payments were applied. The balances are true. They're correct. They're due and owing."

{¶ 28} Earl again claimed at the conclusion of trial, without objective evidentiary support and contrary to evidence showing a litany of significant reductions and adjustments granted benefitting appellants, that this case entailed, "False and deceptive entries." The case was submitted and taken under advisement.

{¶ 29} On November 8, 2021, the trial court granted judgment to appellee in the amended, reduced amount of $6,481.31. This appeal ensued.

8.

**{¶ 30}** In the first assignment of error, appellants argue that the collection judgment underlying this appeal was not supported by sufficient evidence and was against the manifest weight of the evidence. We do not concur.

**{¶ 31}** It is well-established that when a sufficiency of the evidence claim is evaluated on appeal, "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶ 32}** In conjunction, the standard of review for manifest weight of the evidence claims is the same in civil cases as it is in criminal cases. *State v. Thompkins*, 78 Ohio St.3d 387, 678 N.E.2d 541 (1997). As set forth in *State v. Prescott*, 190 Ohio App.3d 702, 2010-Ohio-6048, 943 N.E.2d 1092, ¶ 6 (6th Dist.). "When determining whether a conviction is against the manifest weight, the appellate court must review the record, weigh the evidence and all reasonable inferences drawn from it, consider the witnesses' credibility and decide, in resolving any conflicts in the evidence, whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

**{¶ 33}** In support of the first assignment, appellants make unilateral, unsupported claims regarding the veracity of the billing statement documentation arising from the

9.

health care services provided to appellants. Appellants mistakenly assert that appellee, "Did not present any evidence as to the accuracy of the statements."

{¶ 34} On the contrary, the record of evidence encompasses considerable evidence, both testimonial and documentation, reflective of the legitimacy of the billing statements submitted in support of this case.

{¶ 35} The record reflects the detailed, unrefuted testimony of Delgado and Gfell demonstrative of the legitimacy of the billing statement documentation. The record reflects that Gfell testified in detail regarding the routine accounting actions, which included an array of reductions, adjustments, and write-offs, uniformly accruing to the benefit of appellants.

{¶ 36} We find that Robert Earl's unsupported claims of general malfeasance do not constitute a demonstration of improprieties in the billing documentation.

{¶ 37} We find that Christine Earl's testimony that she, "[S]poke with [Gfell] on a number of occasions about [her desire to rewrite] the loan [and that appellee] * * * refused anything less than a $300 a month [post-default] payment [to avoid collection action]," does not demonstrate accounting or billing impropriety.

{¶ 38} The record reflects that following ongoing, considerable efforts by the service providers over the course of several years to reduce and minimize the outstanding balances owed by appellants, and then arranging a 60-month, interest-free, minimum-monthly-payment plan, appellants defaulted, triggering collection action.

10.

{¶ 39} We have carefully reviewed and considered this matter. We find that the record encompasses sufficient evidence that, when construed in the light most favorable to appellee, shows no error or impropriety in connection to the disputed collection judgment.

{¶ 40} Upon weighing the opposing evidence presented by the parties, we find that the credibility of the unrefuted documentary and testimonial evidence submitted by appellee plainly outweighs the unilateral claims of generic malfeasance submitted by appellants. The record does not reflect that, in resolving conflicts in the evidence, the trial court clearly lost its way and created a manifest miscarriage of justice. Appellant's first assignment of error is found not well-taken.

{¶ 41} In appellant's second assignment of error, appellant contends that there was trial court error related to appellants' claims that their reliance upon the past practices of Fisher-Titus should be construed so as to warrant a reversal in this case. We do not concur.

{¶ 42} Specifically, in support of the second assignment of error, appellants assert, "There was a past practice from Fisher Titus [in] assisting appellant * * * [in obtaining] a five-year loan in which 18 months of payments had been made [before the triggering default by appellants] * * * Mrs. Earl relied on the past practice and promises * * * The trial court should have * * * denied appellee's complaint."

11.

**{¶ 43}** Appellant's assertion in the second assignment of error is conspicuous in its absence of supporting legal authority for the mistaken claim that in offering various, voluntary forms of assistance to appellants in an effort to cooperatively resolve their debt, prior to assigning the matter to appellee following appellants' default, Fisher-Titus was thereby foreclosed from pursuing debt collection action against appellants. Appellant's second assignment of error is found not well-taken.

**{¶ 44}** On consideration whereof, the judgment of the Norwalk Municipal Court is hereby affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

Thomas J. Osowik, J.

Christine E. Mayle, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.